UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
UNITED STATES OF AMERICA,

              - against -                          **MEMORANDUM OF DECISION**

ANGELO GIGLIOTTI and GREGORIO           15 CR 204 (RJD) (RER)
GIGLIOTTI,

                    Defendants.
-------------------------------------------------------- x

DEARIE, District Judge:

      Defendants Gregorio Gigliotti and Angelo Gigliotti were each convicted of multiple

criminal counts on July 22, 2016, following a roughly two-week jury trial.  Prior to the close of

jury selection, the government raised an objection pursuant to Batson v. Kentucky, 476 U.S. 79

(1986), arguing that defendants had exercised peremptory challenges based on gender.  After

reviewing the record and defense counsel's proffered explanations for their challenges, this

Court disallowed two of defendants' peremptory strikes and reinstated the two previously-

dismissed jurors.  The Court briefly explained its rationale for doing so at that time, but promised

a memorandum of decision to follow.

BACKGROUND[1]

      Jury selection began on July 11, 2016.  After the Court qualified twenty-eight potential

jurors—fifteen women and thirteen men—the parties each exercised their peremptory

challenges.  The government exercised six peremptory challenges, while the defendants, jointly,

exercised ten.  The Court then seated the twelve remaining jurors and proceeded with the

selection of alternate jurors.

-----

[1]    The Court here provides a summary of only the factual background relevant to this decision,
as the broader factual background of this case has been outlined in some detail previously.
See Mem. & Order, June 30, 2016, ECF No. 164; Mem. & Order, Nov. 6, 2015, ECF No.
104.

Midway through the selection of alternates, the government raised a <u>Batson</u> challenge. The government noted that when the panel was seated, it had noticed that only one of the twelve jurors was a man. This had prompted the government to review the parties' peremptory challenges and discover that all ten of the individuals struck by the defense were men.[2] The government argued, and the Court agreed, that this clear pattern constituted a *prima facie* showing that defendants had improperly exercised peremptory challenges based on gender.

Once the selection of the alternate jurors was complete and the jury was excused for the day, the Court called upon defense counsel to tender neutral explanations for their peremptory challenges. The Court asked defense counsel to discuss each challenge in turn, and counsel proffered a range of explanations—some more credible than others—for their decisions. Defense counsel also represented, emphatically, that there had been no prior discussion or understanding arrived at between defense counsel regarding the striking of male jurors. The government was invited to participate in the discussion, and it provided input at various points.

Reviewing each challenged juror in turn,[3] defense counsel proffered the following explanations for their decision to strike:[4]

- *Juror 2*: The juror appeared to be very "corporate," had an analytics background, had previously been on a civil jury, had a brother who was an intellectual property lawyer, and had a sister-in-law who was a lawyer.[5]

---

[2]   The government, for its part, used two of its six peremptory challenges against men.

[3]   The Court here refers to each juror by his or her number on the pre-peremptory challenge pool of twenty-eight, rather than his or her number on the post-peremptory challenge panel of twelve.

[4]   A more thorough review of the prospective jurors' answers during *voir dire*, as well as defense counsel's proffered explanations for their ten peremptory challenges, is provided in the Appendix to this decision.

[5]   The record, however, shows that Juror 2 made no mention of any such sister-in-law.

- *Juror 3*: The juror served on a jury that went to verdict, had a pronounced Spanish accent, and had a background in law enforcement.[6]

- *Juror 4*: Defense counsel struck the juror based on a "gut" instinct because the juror looked angry and unhappy to be there.

- *Juror 12*: The juror had a father-in-law who was a police officer, and the juror was required to return to work within two weeks.

- *Juror 15*: The juror had two brothers in the New York City Police Department ("NYPD") and a brother-in-law at the United States Department of Homeland Security ("DHS").[7]

- *Juror 16*: Defense counsel struck the juror based on a "gut" instinct and discussion with their clients.

- *Juror 18*: The juror had friends and relatives currently or formerly in the NYPD, and the juror's son was then interning at a sheriff's department.

- *Juror 20*: The juror's mother worked at a bank that had been robbed, and the juror reported problems regarding his upcoming schedule.[8]

- *Juror 21*: The juror had a sister-in-law in the NYPD and a very strong Eastern European accent.

- *Juror 27*: The juror stated that a civil jury on which he had served had found a party to be "guilty," the juror said "I think so" when asked whether he could be fair and impartial, and the juror had a pronounced Spanish accent. Defense counsel also struck the juror based on discussion with their clients.

At the conclusion of the colloquy, the Court stated that it would take the matter under consideration. The Court also invited the parties to provide the Court with any further input on this matter in advance of July 13, 2016, when the trial was scheduled to begin. In particular, the Court noted that it would welcome the parties' suggestions regarding how the Court should

---

[6]   The record, however, shows that Juror 3 made no mention of having a law enforcement background or ties to law enforcement.

[7]   The record shows that Juror 15 stated that the individual who is now at DHS is one of the two brothers who were formerly at the NYPD.

[8]   Defense counsel at one point stated her belief that the robbery was at gunpoint, but the record shows that Juror 20 made no mention of that being the case.

proceed, as a practical matter, in the event that it were to find certain strikes to have been impermissible. Neither party, however, accepted the Court's invitation.

The Court reconvened on July 13, 2016, for the first day of trial. The Court announced that after reviewing the *voir dire* transcript and defense counsel's proffered explanations for their strikes, it found two instances in which defense counsel's explanations were insufficient. Specifically, the Court found that defense counsel had failed to offer credible, gender-neutral explanations for their strikes of Jurors 3 and 16.[9] The Court, therefore, directed that both jurors be reseated on the jury.[10]

After consultation with the parties, the Court directed that the two jurors be seated in the same seats they would have occupied had they never been struck by the defense. The other jurors, including the alternates, were then shifted down one or two seats, as necessary, and the jury was sworn. Neither party objected to this method of reinstating the jurors.[11]

## DISCUSSION

Under Batson and its progeny, "a defendant in a criminal case may not, consistent with the Constitution, exercise peremptory challenges based on gender." United States v. Martinez,

---

[9]    Prior to announcing its decision, the Court inquired as to whether the government maintained its objection. The government stated that it did, and it argued that defendants had failed to provide neutral explanations for their strikes of Jurors 3, 12, 18, and 21.

[10]   Fortunately, this was still an option, as all ten jurors struck by the defense on July 11, 2016, had been contacted following jury selection and instructed to report back to court on July 13, 2016.

[11]   Although not relevant to the Batson issue, there was some minor disagreement amongst the parties regarding how to handle the placement of one juror. The disagreement flowed from the fact that during the selection of alternates, one of the already-seated, non-alternate jurors announced that she could not, in fact, serve. She was excused, and the first alternate was later moved to the excused juror's place. Defense counsel argued that this adjustment, which took place at the end of the day on July 11, 2016, should be reconsidered to take into account what would have happened at that time had Jurors 3 and 16 never been struck. After some discussion, the Court rearranged the jurors in accordance with defense counsel's suggested approach.

4

621 F.3d 101, 103 (2d Cir. 2010).  In assessing whether such impermissible conduct has

occurred, the Court employs a three-part burden-shifting framework:

> First, the objecting party must make a *prima facie* case that
> opposing counsel exercised a peremptory challenge on the basis of
> a protected class.  To establish a *prima facie* case of purposeful
> discrimination, the objecting party must show that the other party
> challenged members of a specific group and that the totality of the
> circumstances raises an inference of discriminatory motive.
>
> Second, if a *prima facie* case is established, the burden shifts to the
> challenged party to present a nondiscriminatory reason for striking
> the jurors in question.  At this stage, proffered explanations are
> deemed valid unless discriminatory intent is inherent in the
> challenged party's explanation.  Although the challenged party
> must present a comprehensible reason, the second step of this
> process does not demand an explanation that is persuasive, or even
> plausible; so long as the reason is not inherently discriminatory, it
> suffices.
>
> Finally, if a valid reason is articulated, the trial court considers the
> totality of the circumstances to determine whether the objecting
> party has carried its burden of proving purposeful discrimination
> by a preponderance of the evidence.

Martinez, 621 F.3d at 108-09 (internal quotation marks and citations omitted).  Throughout this

process, "the ultimate burden of persuasion regarding [improper] motivation rests with, and

never shifts from, the opponent of the strike."  Id. at 109 (alteration in original) (quoting Rice v.

Collins, 546 U.S. 333, 338 (2006)).

The Court readily concludes that the government made out a *prima facie* case.  The

Second Circuit has acknowledged that "[i]n certain circumstances, a pattern of peremptory

challenges alone may give rise to an inference of impermissible discrimination."  Martinez, 621

F.3d at 110.  It has also cautioned that "[o]nly a rate of minority challenges significantly higher

than the minority percentage of the venire would support a statistical inference of

discrimination," United States v. Alvarado, 923 F.2d 253, 255 (2d Cir. 1991), but here,

defendants used all ten of their peremptory strikes against men, after starting with a pool of

qualified jurors that included more women than men. Such a pattern is more than enough to support an inference of discrimination. See Miller-El v. Cockrell, 537 U.S. 322, 342 (2003) ("The prosecutors used their peremptory strikes to exclude 91% of the eligible African-American venire members, and only one served on petitioner's jury. In total, 10 of the prosecutors' 14 peremptory strikes were used against African-Americans. Happenstance is unlikely to produce this disparity."); Alvarado, 923 F.2d at 256 ("We think a challenge rate nearly twice the likely minority percentage of the venire strongly supports a *prima facie* case under Batson."). These figures also readily distinguish this case from others where no *prima facie* case was found to have been established. See, e.g., Martinez, 621 F.3d at 110-11 (concluding that the district court did not abuse its discretion in finding no *prima facie* case, but only where (a) the government had used only four strikes in a row against men and (b) more than half of the prospective jurors were men).

The burden thus shifted to defendants to offer nondiscriminatory explanations for their peremptory strikes, and defense counsel were, for the most part, able to do so. With regard to nine of the ten jurors struck by the defense, counsel were able to tender a range of explanations for their challenges, including ties to law enforcement, prior jury experience, specific professional backgrounds, hostile demeanors, scheduling difficulties, perceived language difficulties, exposure to violent crime, or other specific answers given during *voir dire*. Resolving some doubts in favor of the defense, such explanations were sufficient, with regard to those nine challenges, to meet defendants' burden at the second step of the Batson analysis.

In the case of one juror, however, defense counsel failed to tender any meaningful explanation for their decision to strike. Specifically, in the case of Juror 16, counsel for Gregorio offered only the following during the colloquy on July 11, 2016:

6

> Part of this was just gut, Your Honor. He's a high school physics
> teacher. Really nothing else that [stuck] out about [Juror 16]. It
> certainly wasn't gender based, but I don't have anything to add
> with regard to him.

Counsel for Angelo had little to add:

> This was also [based on] discussion with client as well. So
> sometimes you get client input into these things, and I think we
> have to listen to those.

"Gut" can sometimes satisfy the second step of the Batson analysis, but only where such

gut instincts flow from *some* articulable basis. See Brown v. Kelly, 973 F.2d 116, 121 (2d Cir.

1992) ("An impression of the conduct and demeanor of a prospective juror during *voir dire* may

provide a legitimate basis for the exercise of a peremptory challenge."); Francis v. Duncan, No.

03-cv-4959 (DC), 2004 WL 1878796, at *15 (S.D.N.Y. Aug. 23, 2004) ("[C]ourts in the Second

Circuit have found that demeanor and a 'feeling' that a juror is 'not overly forthcoming' in

answering questions satisfy the race neutrality requirement of Batson."); Sutton v. Berbary, No.

02-cv-3446 (TPG), 2003 WL 22339275, at *1-2 (S.D.N.Y. Oct. 14, 2003) (finding prosecutor's

explanation that he had a "gut reaction" to a particular juror who was "not overly cooperative"

and not "overly forthcoming" when responding to questions to be satisfactory). As the Eleventh

Circuit reasoned:

> While the reasons given by the prosecutor "need not rise to the
> level justifying exercise of a challenge for cause," the prosecutor
> must nevertheless "give a clear and reasonably specific explanation
> of his legitimate reasons for exercising the challenges." The
> prosecutor's explanation in the present case, "I just got a feeling
> about him," obviously falls short of this requirement. As the
> Batson court concluded, "If [such] general assertions were
> accepted as rebutting a defendant's *prima facie* case, the Equal
> Protection Clause would be but a vain and illusory requirement."

United States v. Horsley, 864 F.2d 1543, 1546 (11th Cir. 1989) (alteration in original) (internal

citations omitted) (quoting Batson, 476 U.S. at 97-98); see also Briggs v. Grounds, 682 F.3d

1165, 1187 (9th Cir. 2012) ("In contrast to aspects of demeanor such as 'nervousness' or 'inattention' upon which prosecutors often rely, no judge could discern whether a prospective juror was giving a prosecutor a 'warm feeling.'" (internal citation omitted)); <u>United States v. Bentley-Smith</u>, 2 F.3d 1368, 1380 (5th Cir. 1993) ("Hostile facial expressions and body language can be observed in the courtroom; therefore the truth or falsity of explanations of this kind is subject to proof. In contrast, an explanation based upon unsupported intuition is not subject to observation and not subject to proof." (internal quotation marks and citation omitted) (favorably quoting the dissent)).

Indeed, defense counsel provided just such an articulable basis for their gut reaction to Juror 4, stating that the juror "looked generally angry, not happy to be here," and that it "[d]idn't seem that [the juror] was going to want to sit on this jury." With respect to Juror 16, however, defense counsel provided no similar articulable basis for their negative gut reaction, stating only that the juror was a high school physics teacher—with no explanation as to how that fact might favor striking the juror.

Experienced practitioners and judges observe that in the real world of jury trial practice, one's gut or intuition sometimes plays a part. This Court recognizes this practical dynamic and therefore proceeds with great caution in weighing a <u>Batson</u> challenge, giving as much deference to counsel as judgment and common sense permit. But there should always be something more than simply gut, some factor that triggers the judgment to pursue or pass on a particular prospective juror. With respect to Juror 16, that "something more" does not exist. As such, defense counsel's strike of that juror does not survive scrutiny under <u>Batson</u>.[12]

---

[12]    The Court recognizes that shortly before it announced its decision on this matter, the government indicated that the strike of Juror 16 was not among the four for which it felt defense counsel's explanations were lacking. Whatever inspired the government's position,

Turning back to the other nine peremptory strikes in question, the Court—having found defendants to have offered gender-neutral explanations as to those strikes—proceeds to the third step of the <u>Batson</u> analysis, where the Court has "the duty to determine if the [objecting party] has established purposeful discrimination." <u>Batson</u>, 476 U.S. at 98. This stage of the analysis "requires a trial judge to make 'an ultimate determination on the issue of discriminatory intent based on all the facts and circumstances,'" <u>Jordan v. Lefevre</u>, 206 F.3d 196, 200 (2d Cir. 2000) (quoting <u>Alvarado</u>, 923 F.2d at 256), and "compels courts to determine 'the credibility of the proffered explanations.'" <u>Barnes v. Anderson</u>, 202 F.3d 150, 156 (2d Cir. 1999) (quoting <u>Alvarado</u>, 923 F.2d at 256); <u>see also</u> <u>Cockrell</u>, 537 U.S. at 338-39 ("[T]he critical question . . . at step three is the persuasiveness of the [challenged party's] justification for his peremptory strike."). "The [Supreme] Court [has] described this duty of assessing the credibility of the [challenged party's gender-]neutral reasons as embodying the 'decisive question' in the <u>Batson</u> analysis." <u>Jordan</u>, 206 F.3d at 200 (citing <u>Hernandez v. New York</u>, 500 U.S. 352, 365 (1991)).

"Credibility can be measured by, among other factors, the [challenged party's] demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." <u>Cockrell</u>, 537 U.S. at 339. Also relevant are "side-by-side comparisons of some [male] venire panelists who were struck and [female] panelists allowed to serve." <u>Miller-El v. Dretke</u>, 545 U.S. 231, 241 (2005). "If a [challenged party's] proffered reason for striking a [male] panelist applies just as well to an otherwise-similar [female panelist] who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at <u>Batson</u>'s third step." <u>Id</u>; <u>see also</u> <u>Foster v. Chatman</u>, 136 S. Ct. 1737, 1750 (2016) ("Still other explanations given by the prosecution, while not explicitly

---

it does not alter the Court's determination that defense counsel failed to offer an acceptable, gender-neutral explanation for their strike of Juror 16.

contradicted by the record, are difficult to credit because the State willingly accepted white jurors with the same traits that supposedly rendered [the black prospective juror] an unattractive juror.").

Giving defense counsel considerable benefit of the doubt, the Court finds counsel's explanations to be credible and sufficient with respect to eight of the nine remaining peremptory strikes. With respect to the strike of Juror 3, however, the Court finds defense counsel's proffered explanations to be lacking.

During the colloquy on July 11, 2016, counsel for Gregorio stated the following with respect to Juror 3:

> [Juror] 3, had a case, I think, that went to verdict in Suffolk County, had some law enforcement background. Although we couldn't eliminate everybody who had brought a case to verdict[,] I sometimes am wary of that. It seems to me that once that happens, they are more inclined to convict, particularly if it is a criminal case that they've served in. So that's always a red flag for me. But other than that, I don't have any particular note on why we got rid of [Juror 3].

Counsel for Angelo then added:

> Juror . . . 3, what I recall is he did have a fairly pronounced Spanish accent . . . I know that was something that I was concerned about, and I was thinking about.

Contrary to defense counsel's assertion, the record does not reflect that Juror 3 had any law enforcement background. The government noted this during the colloquy on July 11, 2016, and it also noted that it was a civil jury, rather than a criminal jury, on which Juror 3 had previously served. Also, while defense counsel offered Juror 3's jury experience as a reason he was struck, the Court notes that defense counsel did not strike Juror 5 (a male juror who had served on juries in two murder cases, one of which reached a verdict), Juror 11 (a female juror who had served on a civil jury, albeit one that did not reach a verdict), Juror 13 (a female juror

10

who had served on a grand jury), Juror 17 (a male juror who had served on a jury in a drunk driving case that reached a verdict), Juror 19 (a female juror who had served on a civil jury in a case that settled), Juror 22 (a female juror who briefly served on a civil jury in a case that settled), Juror 24 (a female juror who had served on a jury as an alternate), or Juror 28 (a female juror who had served on a grand jury).  None of the female jurors had specifically served on a jury that reached a verdict, but several of them had previously served in some capacity, and two male jurors who were not struck had served on juries that reached verdicts—one in a murder case, the other in a drunk driving case.

Considering all this, the Court is simply unable to conclude that defense counsel's proffered reasons for their strike of Juror 3 constitute a credible, gender-neutral explanation.  The Court, therefore, finds that not only was defendants' strike of Juror 16 improper, but so too was their strike of Juror 3.

CONCLUSION

The foregoing, along with the Court's remarks on the record in open court on July 13, 2016, constitute the basis for the Court's decision to sustain the Batson challenges regarding Jurors 3 and 16.


Dated: Brooklyn, New York
      November 14, 2016

s/ RJD

RAYMOND J. DEARIE
United States District Judge

11

**APPENDIX**

| # | Name | Gender | Challenger | Prior Jury Service | Ties to Law Enforcement | Other Notes from *Voir Dire* | Defendants' Proffered Explanation for the Challenge |
|---|------|--------|-----------|--------------------|--------------------------|------------------------------|-----------------------------------------------------|
| 1 | Tina Carew | F | | None | Uncle, aunt, and friends are in law enforcement | Works for the Board of Education; never been the victim of a crime; had a medical procedure scheduled for Thursday of the second week of trial | |
| 2 | Gregory Bronn | M | Defense | Served as an alternate on a state civil jury nine years ago | None | Director of strategy and analytics for American Express; brother is an IP lawyer | Seemed to be very corporate; had an analytics background; served on a civil jury; had a brother who was an IP lawyer; had a sister-in-law who was a lawyer (*the record shows that the juror did not, in fact, mention having a sister-in-law who was a lawyer*) |
| 3 | Jose Fernandez | M | Defense | Served on a civil jury two years ago that reached a verdict | None | Does fitness training, athletics, and backpacking | Served on a jury that went to verdict; had a pronounced Spanish accent; had some law enforcement background (*the record shows that the juror did not, in fact, mention having any law enforcement background or ties to law enforcement*) |
| 4 | Delon Desouza | M | Defense | None | None | Telephone maintainer for NYC Transit Authority; never been the victim of a crime | Gut instinct based on juror looking angry and unhappy to be there |
| 5 | George Sawaya | M | Government | Served on juries in two murder cases; one reached a verdict | None | Personal injury defense attorney; Of Counsel to NYC, examining claimants suing NYPD officers; used to represent police officers in federal civil rights actions; never been the victim of a crime | |

| # | Name | Gender | Challenger | Prior Jury Service | Ties to Law Enforcement | Other Notes from *Voir Dire* | Defendants' Proffered Explanation for the Challenge |
|---|------|--------|-----------|-------------------|------------------------|------------------------------|---------------------------------------------------|
| 6 | Kyla McHale | F | | None | Close friend in the Philadelphia PD; cousins in the NYPD and the New Jersey PD | Program manager in arts education; had to leave for a wedding on Friday of the second week of trial; never been the victim of a crime | |
| 7 | Christine Emigholz | F | | None | None | Student at St. Joseph's; never been the victim of a crime | |
| 8 | Jolenn Germosen | F | Government | None | None | "Client navigator" at Bellevue Hospital; never been the victim of a crime | |
| 9 | Zahava Segal | F | Government | Not asked | Daughter's father-in-law is a judge | Bookkeeper at a jewelry shop | |
| 10 | Debra Ambrosini | F | | None | Acquaintances are involved in law enforcement | Office supervisor for a medical practice; never been the victim of a crime; does not have reliable coverage at work | |
| 11 | Judy Pappas | F | | Served on a state civil jury that did not reach a verdict | None | Retired accountant; never been the victim of a crime | |

2

| # | Name | Gender | Challenger | Prior Jury Service | Ties to Law Enforcement | Other Notes from *Voir Dire* | Defendants' Proffered Explanation for the Challenge |
|---|------|--------|------------|-------------------|------------------------|------------------------------|----------------------------------------------------|
| 12 | Thomas Mangan | M | Defense | None | Father-in-law is retired law enforcement; a former student and friend is in the NYPD | High school administrator; never been the victim of a crime; has to report back to work after two weeks | Had a father-in-law who was a police officer; had to return to work after two weeks |
| 13 | Marlene Petlick | F | Government | Served on a grand jury | Friend volunteers with parolees | Part-time telemarketer for the NYC Ballet; claimed financial hardship if the trial were to last more than two weeks | |
| 14 | Lisa Maldari-Lynch | F | | None | None | Elementary school teacher; never been the victim of a crime | |
| 15 | Thomas Anderson | M | Defense | None | Two brothers are former NYPD; one brother is now at DHS, the other went to FDNY | Director of human resources in shipping for warehouse distribution company; had car stolen many years ago | Had two brothers in the NYPD and a brother-in-law at DHS (*the record shows that the individual at DHS was one of the juror's two brothers who had previously served in the NYPD*) |
| 16 | Justin King | M | Defense | None | Aunt is retired NYPD | High school physics teacher; never been the victim of a crime | Gut instinct and discussion with clients |
| 17 | Matthew Stoger | M | | Served on a jury in a drunk driving case that reached a verdict | Friend was an NYPD officer; now a firefighter | Works for solar installation company; never been the victim of a crime | |

| # | Name | Gender | Challenger | Prior Jury Service | Ties to Law Enforcement | Other Notes from *Voir Dire* | Defendants' Proffered Explanation for the Challenge |
|---|------|--------|------------|--------------------|------------------------|------------------------------|---------------------------------------------------|
| 18 | Peter Johnson | M | Defense | None | Friends are retired NYPD; wife's cousin is in the NYPD; son was interning for Nassau County Sheriff's Dept. | MTA NYC Transit train service supervisor; has been the victim of property theft | Had friends and relatives currently or formerly in the NYPD; juror's son was then interning at a sheriff's department |
| 19 | April Henderson | F | | Served on a civil jury in a car accident case that settled | None | Clinical social worker; never been the victim of a crime; Court asked follow up regarding her answer that she could "probably" serve on the jury | |
| 20 | Danny Lundy | M | Defense | None | None | Student (MPA); might be called for an interview for an upcoming internship; mentioned other commitments that could be moved; mother worked at a bank that had been robbed | Juror's mother worked at a bank that had been robbed (*counsel believed the robbery was at gunpoint, but the record shows no mention of this by the juror*); juror reported problems with his upcoming schedule |
| 21 | Dmitriy Falberg | M | Defense | None | Sister-in-law used to be in the NYPD | Works for Cantor Fitzgerald as IT support; never been the victim of a crime | Had a sister-in-law in the NYPD; had a very strong Eastern European accent |
| 22 | Anna Marks | F | | Briefly served on a case that settled | None | Special education paraprofessional; never been the victim of a crime | |
| 23 | Orlando Flores | M | Government | Not asked | None | College student (electrical engineering and technology major); never been the victim of a crime | |

| # | Name | Gender | Challenger | Prior Jury Service | Ties to Law Enforcement | Other Notes from *Voir Dire* | Defendants' Proffered Explanation for the Challenge |
|---|------|--------|-----------|-------------------|------------------------|------------------------------|------------------------------------------------------|
| 24 | Jacqueline Maxwell | F | Government | Served as an alternate | Friends are retired law enforcement; landlord is in law enforcement | Assistant teacher at a day care; someone once tried to grab her bag late at night and there was an altercation | |
| 25 | Beatriss Starobinsky | F | | None | Has friends or family in law enforcement; knows judges | Elementary school music teacher; never been the victim of a crime | |
| 26 | Debra Crawford-Bettis | F | | None | Brother, uncle, and nephew are current/retired police officers or correctional officers | Very nervous; supervisor at Bank of New York; never been the victim of a crime | |
| 27 | Ernesto Velasco | M | Defense | Served on a jury in a civil case that reached a verdict | None | Works at health food store; said that a civil jury he had served on had found a party to be "guilty"; never been the victim of a crime; juror said "I think so" when asked whether he could be fair and impartial | Juror stated that a civil jury he had served on had found a party to be "guilty"; said "I think so" when asked whether he could be fair and impartial; had a pronounced Spanish accent; the challenge was also based on discussion with clients |
| 28 | Karen Pecoraro | F | | Served on a state grand jury | Friends in law enforcement | Middle school teacher; never been the victim of a crime; when asked if she could serve, she said "sure" | |

5